## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LABORERS' DISTRICT COUNCIL OF | : | |
| WESTERN PENNSYLVANIA PENSION FUND; | : | Civil Action No. _____ |
| PHILIP AMERIS; and JOHN C. BUSSE, | : | |
| Trustees *ad litem*, on behalf of themselves and | : | |
| all others similarly situated, | : | |
| | : | |
| Plaintiffs | : | **Class Action** |
| | : | |
| v. | : | |
| | : | |
| AUSTIN CAPITAL MANAGEMENT, LTD.; | : | |
| AUSTIN CAPITAL MANAGEMENT GP CORP.; | : | |
| DAVID E. FRIEDMAN; CHARLES W. RILEY; | : | |
| JAMES P. OWEN; BRENT A. MARTIN; DAVID | : | |
| C. BROWN; ROBERT L. WAGNER; VICTORY | : | |
| CAPITAL MANAGEMENT; and KEYCORP, | : | |
| | : | |
| Defendants | : | |

## COMPLAINT

Plaintiffs, Laborers' District Council of Western Pennsylvania Pension Fund (the "Fund"), Philip Ameris and John C. Busse, on behalf of themselves and the class of fiduciaries of employee benefit funds as defined below, upon personal knowledge as to facts pertaining to themselves and upon information and belief and upon the investigation of their counsel as to all other matters, allege as follows:

## INTRODUCTION

1.     This is a class action pursuant to the Employee Retirement Income Security Act, *as amended*, 29 U.S.C. § 1001 *et seq.* ("ERISA"), seeking equitable relief, including restitution, for employee retirement benefit funds whose assets were lost by risky and imprudent investments in the fraudulent investment schemes of Bernard L. Madoff ("Madoff") and Bernard L. Madoff Investment Securities, LLC ("Madoff Securities"). According to federal prosecutors, Madoff is

responsible for the loss of as much as $64 billion through a giant Ponzi scheme in which early investors were paid with the invested proceeds of later investors.

2.       Defendant Austin Capital Management, Ltd. ("ACM") is a financial investment management firm and is a fiduciary to many employee pension benefit plans like the Plaintiff Fund who retained its services.  ACM directed significant amounts of investment, estimated at present to be $186 million, into Madoff-related investment vehicles, virtually all of which were lost when the Ponzi scheme became known to the public in December 2008.

3.       Although ACM was a fiduciary to the Fund and had a duty to act prudently with respect to any investment, it failed to adequately investigate, conduct a complete and proper due diligence, and evaluate the evidence that any Madoff-related investment would be risky, imprudent and inappropriate for a pension plan.  ACM's lack of due diligence resulted in the failure to discover or properly evaluate the numerous "red flags," including:

a.       the lack of transparency in the operations of Madoff and Madoff Securities, including Madoff's refusal to disclose his investment strategy;

b.       the fact that investment returns of Madoff Securities were abnormally consistent and positive, with very little volatility, including only five months of negative returns in the past 12 years;

c.       the inability of other funds using a "split-strike conversion" strategy (which Madoff asserted was his method) to generate returns in any way comparable to those allegedly earned by Madoff and Madoff Securities;

d.       the almost perfect timing of trades to achieve maximum results, virtually impossible to accomplish in the real world;

e.     the fact that Madoff Securities generated revenue only through transaction-based commission fees, whereas most hedge funds charge investment management fees based on the fund's performance;

f.     the fact that monthly account statements sent to Madoff investors did not support the returns supposedly being earned;

g.     despite the large size and scale of the assets being handled by Madoff Securities, its auditors, Friehling & Horowitz, consisted of one office in Rockland County, New York, with only three employees: one of whom was 78 years old and lived in Florida (he has since died), and one of whom was a secretary;

h.     instead of using an outside prime broker as nearly all hedge funds do, Madoff was his own prime broker and custodian of all the assets he managed, thus eliminating any independent custodian who could verify and establish the existence of assets;

i.     Madoff Securities' comptroller was based in Bermuda, while most mainstream hedge funds have in-house comptrollers;

j.     although they were making all the investment decisions for several large "feeder funds," neither Madoff nor Madoff Securities were registered with the Securities and Exchange Commission ("SEC") as investment advisors;

k.     between 2000 and 2007, one of Madoff's competitors, Harry Markopolos, communicated with the SEC numerous times describing how the returns supposedly achieved by Madoff Securities were impossible and that the Madoff business was in fact a fraudulent Ponzi scheme;

l.     the number of available options was much smaller than the number of

options that would have had to have been traded in order to execute the "split strike conversion" strategy described by Madoff;

      m.      Madoff liquidated his securities positions at the end of each quarter, reporting only U.S. Treasury bills as holdings, which prevented investors or anyone else from knowing what securities he had purchased;

      n.      former employees were sworn to secrecy about Madoff's activities;

      o.      key positions at Madoff Securities were held by Madoff family members; and

      p.      investors with Madoff Securities did not have electronic access to their accounts but were instead given fraudulently created paper tickets that "confirmed" trades.

      4.      Notwithstanding all the red flags described above, ACM continued to recommend and invest hundreds of millions of dollars in hedge funds that placed all or virtually all of their investments with Madoff and Madoff Securities on behalf of Plaintiffs and the members of the Class, in violation of Defendants' fiduciary duties.  As a result, Plaintiffs and the members of the Class suffered hundreds of millions in losses.

## JURISDICTION AND VENUE

      5.      This matter arises under Sections 409 and 502(a)(2) & (3) of the Employee Retirement Income Security Act ("ERISA"), *as amended*, 29 U.S.C. § 1109, 1132(a)(2) & (3). This Court has subject matter jurisdiction pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1132(e), and 28 U.S.C. §§ 1331 and 1337.

      6.      Venue is appropriate in this Court pursuant to 29 U.S.C. § 1132(e)(2), since the Defendants do substantial business in this District, and another class action seeking to represent a

nationwide class against ACM concerning the same facts is pending before this Court.

## PARTIES

7.     Plaintiff  Laborers' District Council of Western Pennsylvania Pension Fund (the "Fund") is a voluntary trust and an employee pension benefit plan within the meaning of ERISA. The Fund's principal offices are at 1425 Forbes Avenue, Pittsburgh, Pennsylvania 15219.  The Fund provides defined benefit pensions to approximately 14,159 participants and their beneficiaries located in the area of Western Pennsylvania.  As of December 31, 2008, the Fund held approximately $511,782,622 in assets.  The Board of Trustees of the Fund, in their capacity as fiduciaries, have authorized this suit.

8.     Plaintiff Philip Ameris maintains a business office in Allegheny County, Pennsylvania.  He is the President and Business Manager of the Laborers' District Council of Western Pennsylvania (the "Union"), and a Trustee and Chairman of the Board of Trustees of the Fund.  He brings this action in his own name, as a Fund fiduciary, and as Trustee *ad litem* for the Fund.

9.     Plaintiff John C. Busse maintains a business office in Allegheny County, Pennsylvania.  He is President of F.J. Busse Co., and a Trustee and Secretary-Treasurer of the Board of Trustees of the Fund.  He brings this action in his own name, as a Fund fiduciary, and as Trustee *ad litem* for the Fund.

10.     Defendant Austin Capital Management, Ltd. ("ACM") is a Texas limited partnership with its principal offices at 5000 Plaza on the Lake, Suite 250, Austin, Texas 78746. ACM describes itself as "a hedge fund of funds management firm."  The sole general partner in ACM is Austin Capital Management GP Corp. ("ACM-GP"), a Texas corporation.  The sole

limited partner of ACM is KeyCorp.  Both ACM and ACM-GP are wholly owned subsidiaries of

KeyCorp, an Ohio corporation.  ACM places investments with one or more investment funds that

it controls, such as Austin Capital Safe Harbor Portable Alpha Offshore Fund One, Ltd.

("Portable Alpha One"), and others.

      11.     Defendant Austin Capital Management GP Corp. ("ACM-GP") is a Texas

corporation and the sole general partner of ACM.  ACM-GP is wholly owned by KeyCorp.

      12.     Defendant KeyCorp is an Ohio corporation with its principal offices in Cleveland,

Ohio, and is the owner of ACM.  KeyCorp is one of the nation's largest bank-based financial

services companies, with consolidated assets of approximately $98 billion.  KeyCorp provides

investment management services as well as banking and other services to its clients and

customers.  KeyCorp acquired ACM in 2006.  KeyCorp is the sole limited partner of ACM and

sole shareholder of ACM-GP.

      13.     Defendant Victory Capital Management, Inc. ("Victory") is a New York

corporation with its principal offices in Cleveland, Ohio.  It engages in the business of

investment portfolio management.  Victory is wholly owned by KeyCorp.  Victory has

approximately $62 billion in assets that it manages.

      14.     Defendant David E. Friedman is a Managing Director and Chief Operating Officer

of ACM and a Managing Director of the Austin Capital Safe Harbor ERISA Fund.

      15.     Defendant Charles W. Riley was Senior Managing Director of ACM and

President of Austin Capital Management GP Corp.  He was responsible for coordinating and

supervising ACM's research and portfolio construction activities.  As of April 30, 2009, he is

reportedly no longer a member of the Board of Directors for the various investment vehicles

managed by ACM, but remains part of ACM and is still investment manager to the ACM funds.

16.     Defendant James P. Owen is a Managing Director of ACM.

17.     Defendant Brent A. Martin was a Senior Managing Director of ACM.  As of April 30, 2009, he is reportedly no longer a member of the Board of Directors for the various investment vehicles managed by ACM, but remains part of ACM and is still investment manager to the ACM funds.

18.     Defendant David C. Brown is a member of the Board of Directors of ACM-GP and a control person of ACM.  He is also the Senior Managing Director and Chief Operating Officer of Victory.

19.     Defendant Robert L. Wagner is a member of the Board of Directors of ACM-GP and a control person of ACM.  He is also the President and Chief Executive Officer of Victory.

20.     All defendants herein are jointly and severally responsible for the breaches of fiduciary duty herein, in that they constitute an integrated enterprise that shared officers, directors, partners, personnel and other resources for the joint purpose of providing investment management to members of the Class and/or participated in the breaches of fiduciary duty herein. ACM relied on the financial and administrative backing of KeyCorp, including its $100 million of fiduciary and liability insurance, to successfully run its business.  The individual Defendants made the key decisions and/or failed to act in such a way as to directly participate in the breaches of fiduciary duty that harmed Plaintiffs and the Class members.

## FACTUAL ALLEGATIONS

### A.     The Madoff Scheme

21.     Bernard L. Madoff is the founder and majority shareholder of  Madoff Securities.

22.    Madoff Securities is both a broker-dealer and investment advisor, registered with the SEC, that engaged primarily in three distinct operations: (1) investment advisor services; (2) market making services; and (3) proprietary trading.  According to its Form ADV filing with the SEC in January 2008, Madoff Securities had approximately $17 billion in assets under management.  However, Madoff was providing investment advisory services long before he actually registered with the SEC in Fall 2006 as an investment advisor.

23.    Madoff independently conducted his advisory service business apart from the other services provided by Madoff Securities on a separate floor in their New York offices.  He kept the financial statements for Madoff Securities under lock and key and was reportedly "cryptic" about the advisory business when discussing it with other employees of Madoff Securities.  In fact, it was through his investment advisory services business that Madoff conducted his massive Ponzi scheme.

24.    Madoff's client base was broad, ranging from large institutions to charitable foundations to high net worth individuals around the world.  These investors were lured by Madoff's promise of a risk-reducing strategy that would generate returns consistently higher than those available through other investment vehicles.

25.    The capital that provided the fuel for Madoff's fraud was raised largely through "feeder funds," investment vehicles that acted as middle-men between Madoff Securities and the actual investors.  Many of these feeder funds were created by outside advisory firms that marketed the Madoff funds to high net-worth individuals and institutional investors.  Other investors were brought in through hedge funds of funds, such as those run by ACM.

26.    There were several key attractions for those who invested money with Madoff,

either directly or indirectly through feeder funds. First, as the former Chairman of NASDAQ, Madoff had a stellar reputation in the investment community. He also gave the impression that he was highly selective in accepting prospective investors, exuding an aura of exclusivity.

27.    More important to clients was his purported "split-strike conversion strategy" that was executed approximately 6-8 times per year at a cycle of 2-8 weeks. The split-strike strategy involved purchasing a basket of stocks, then writing call options against those stocks, and, in turn, using the proceeds from writing the call options to purchase put options. One of the "red flags" ignored by investors and Madoff's auditors is that, while Madoff's strategy could reduce some volatility in investment outcomes, it would not have made positive returns in every market. However, Madoff claimed that he continued to gain in the declining stock market. As a result, the returns of Madoff's strategy could not be replicated by quantitative analysis.

28.    What all of these investors later learned was that Madoff's "sophisticated" investment strategy was nothing more than a sham. Incoming client money was not invested at all, but was instead used to fund redemptions to existing clients. It was, in short, a Ponzi scheme - or, in Madoff's own words, "one big lie."

29.    Madoff's scheme worked well for many years, but when the credit crisis became acute in the fall of 2008, client redemptions grew exponentially. By December, Madoff's Ponzi scheme began to crack under its own weight.

30.    On December 9, 2008, Madoff advised a fellow senior employee that investors were seeking some $7 billion in redemptions for which Madoff was struggling to secure liquidity. The senior employee previously believed that Madoff's investment advisory service had somewhere in between $8-15 billion in assets under management. Madoff struggled to

secure liquidity but, in the end, knew he could never match incoming client investments with the size of the requested redemptions.

31.      In a subsequent December 2008 meeting, Madoff informed his senior employees that his investment advisory service was "just one big lie" and "basically, a giant Ponzi scheme." He further advised that the company was insolvent and it had been for years.  Nevertheless, having just admitted to $50 billion in lost assets, Madoff advised two of his senior employees that he intended to turn himself in to authorities in one week, but first had approximately $200-300 million remaining that he planned to distribute to select employees, family, and friends.

32.      On December 11, 2008, the SEC filed a civil action and request for emergency relief against Madoff and Madoff Securities to halt the ongoing fraudulent conduct.  *SEC v. Madoff*, No. 08 Civ. 10791 (S.D.N.Y.).

33.      Also on December 11, 2008, Madoff was arrested by federal authorities for securities fraud.  The subsequent criminal information was docketed as *United States v. Madoff*, No. 09 Cr. 213 (S.D.N.Y.).

34.      By order dated December 15, 2008, the Court appointed a trustee to preside over the liquidation of Madoff's business and stayed all further claims against Madoff Securities.

35.      On  February 20, 2009, the court-appointed trustee announced that a thorough investigation of the Madoff Securities offices failed to show that any investments had been made on behalf of investors.  Instead, agents of Madoff Securities had created phoney transaction forms after the fact.

36.      In mid-December 2008, many of those invested with Madoff learned that their exceptional "returns" were, in fact, fictitious – concocted through the largest Ponzi scheme in

financial history – and that, according prosecutors, investors collectively may have lost $64 billion.

37.    On March 12, 2009, Madoff pled guilty to 11 felony counts, including securities fraud, investment advisor fraud, mail and wire fraud, money laundering, perjury and making false statements, and theft from an employee benefit plan.  He described in the allocution how he conducted his Ponzi scheme, and the fact that his investment strategy was a sham that was, in fact, never executed because no trades were ever made.  Madoff was immediately taken into custody.  His sentencing is currently scheduled for June 29, 2009.

38.    On March 17, 2009, the United States District Court for the Southern District of New York issued a criminal complaint against David G. Friehling, Madoff's accountant.  *United States v. Friehling*, No. 09 MJ 729 (S.D.N.Y.).  Friehling was arrested the next day.  Also on March 18, 2009, the SEC filed a civil complaint against Friehling.  *SEC v. Friehling*, No. 08 Civ. 2467 (S.D.N.Y.).  Upon information and belief, the government's investigation into the Madoff-related fraud continues.

### B.    The Fund's Investments With Austin Capital Management

39.    The Fund was created by the Union and the Master Builders Association of Western Pennsylvania, an association of various employers who have collective bargaining agreements with the Union, for the purpose of providing pension benefits to employees who worked under the Union's jurisdiction.

40.    As an employee pension benefit fund, the Fund operates for the sole and exclusive benefit of the participants and beneficiaries.  The Fund is a nonprofit institution.

41.    In 2008, the Fund's Trustees voted to retain ACM for the purpose of managing the

Fund's hedge fund investments.  As of 2008, ACM had approximately $2.3 billion under management for all of its clients.

42.    ACM is a fiduciary of the Fund within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21), in that:

(a)    it exercises discretionary authority or control over a portion of the Fund assets for the purpose of investment;

(b)    it is an investment manager within the meaning of Section 3(38) of ERISA, 29 U.S.C. § 1002(38), which by definition is a fiduciary; and

(c)    it executed an agreement with the Fund expressly recognizing its status as a fiduciary within the meaning of ERISA.

43.    As a fiduciary, ACM had a duty to prudently manage Fund assets for the sole and exclusive interest of the participants and beneficiaries, as set forth in Section 404(a) of ERISA, 29 U.S.C. §1104(a).

44.    ACM invested money in a family of approximately 21 investment vehicles which it operates and controls, including but not limited to: Portable Alpha One; Austin Capital Safe Harbor ERISA Fund, Ltd.; Austin Capital Safe Harbor Master Account, G.P.; Austin Capital Safe Harbor Offshore Fund, Ltd.; Austin Capital Safe Harbor QP Fund, Ltd.; Austin Capital All Seasons Offshore Fund, Ltd.; Austin Capital All Seasons Master Account, G.P.; and Austin Capital Balanced Offshore Fund, Ltd.

45.    ACM used its affiliation with KeyCorp to attract investors.  For example, a questionnaire from Marco Consulting Group, an investment consultant to a number of employee pension plans, asked ACM "what does your firm believe is the most unique aspect of your

investment philosophy or process?  How does this contribute to your firm's value-added?"  ACM responded, stating in part, "[O]ur recent acquisition by KeyCorp and affiliation with its asset management subsidiary, Victory, *provides our firm and clients with the benefits of their financial and administrative backing*, which allowing us to maintain full operational control of the firm and our investment process."  (emphasis added).

46.    In April 2008, the Fund placed $20 million of Fund assets with ACM for investment in Portable Alpha One, an exempt corporation operating under the laws of the Cayman Islands.  ACM is the named Investment Manager for Portable Alpha One.

47.    ACM invested a portion of the Potable Alpha One assets in the Rye Select Broad Market Prime Fund, L.P. ("Rye"), a hedge fund managed by Tremont Holdings.  All of those assets were, in turn, transmitted to Madoff and/or Madoff Securities for investment by them in accordance with the purported Madoff investment strategy.  As of December 1, 2008, ACM's investments in Rye represented approximately 7.5% of Austin Safe Harbor's portfolio.

48.    By an email dated December 15, 2008, the Fund was notified by ACM that the Fund had exposure to Madoff through an investment in a fund of hedge funds managed by ACM.

49.    On December 15, 2008, ACM announced that it had invested a "limited amount in a fund managed by Tremont Holdings, a registered investment advisor, which engaged the firm controlled by Bernard L. Madoff."  *Austin American Statesman*, Dec. 17, 2008.  ACM stated that it was "outraged" at Madoff's alleged conduct and "was taking every measure to protect the interests of our investors. . . ."  *Id.*

50.    Subsequently, ACM decided not to undertake any legal action to recover client funds, but to rely on the class actions brought by other investor plaintiffs to obtain recovery for

harm resulting from Madoff-related activities.

51.    By email dated January 2, 2009, ACM notified the Fund and other investors that financial reports for December 2008 for ACM funds that had investments in Rye would reflect the value of that investment as zero.

52.    ACM also managed assets for a number of other employee pension funds whose assets ACM inappropriately caused to be invested through Madoff Securities, including:

(a)    as much as $170 million for the Massachusetts Pension Reserves Investment Management Board ("Massachusetts Pension Board"), of which $12 million was exposed to Madoff-related investments. *Austin American Statesman*, Dec. 17, 2008.  On or about February 3, 2009, the Massachusetts Pension Board announced that it was withdrawing its assets from ACM's management. *Austin Business Journal*, Feb. 3, 2009;

(b)    approximately $170 million for the New Mexico Education Retirement Board, of which approximately $8-10 million was in Madoff-related investments. *Daily Times*, Dec. 19, 2008;

(c)    approximately $10 million for the Pension Fund for Hospital and Health Care Employees - Philadelphia and Vicinity, of which approximately $700,000 was in Madoff-related investments;

(d)    the Steamfitters Local 449 Retirement Security Fund in Pittsburgh, Pennsylvania;

(e)    Construction Industry and Laborers Joint Pension Trust in Las Vegas, Nevada;

(f)    Plumbers and Pipefitters Local 525 Pension Plan in Las Vegas, Nevada;

(g)     Laborers Local 17 Pension Plan in Newburgh, New York;

(h)     Texas Iron Workers Pension Plan in Texas;

(I)     Sheet Metal Workers National Pension Plan, located in Virginia;

(j)     Niagra-Genesee & Vicinity Carpenters Local No. 280 Pension Plan, located in New York;

(k)     Buffalo Laborers' Pension Fund, located in New York.

**C.     ACM's Failure to Exercise Due Diligence**

53.     For years, there had been numerous red flags and warning signs that any investment through Madoff and/or Madoff Securities would be speculative and imprudent for employee benefit plans.  These included the signs discussed below.

**1.     The 1992 SEC Litigation**

54.     In 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people beginning in 1962, promising them returns of 13.5 to 20 percent, and invested the money entirely with Madoff.  As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients.  No action was taken against Madoff.

**2.     The 1999 Markopolos Warnings**

55.     In May 1999, Harry Markopolos, a derivatives expert with experience managing the "split-strike conversion" strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.

### 3.    The May 2001 *MAR/Hedge* Article

56.    In May 2001, the article "Madoff Tops Charts; Skeptics Ask How" appeared in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry.  In the article, author Michael Ocrant wrote:

a.    "Madoff has reported positive returns for the last 11-plus years in assets managed on behalf of the feeder fund known as Fairfield Sentry.... [The] other [feeder] funds have demonstrated equally positive track records using the same strategy for much of that period."

b.    "Those who question the consistency of the returns... include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives, many of whom are familiar with the so-called split-strike conversion strategy used to manage the assets."   These individuals "noted that others who use or have used the strategy... are known to have had nowhere near the same degree of success."

c.    "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

d.    "The strategy and trading, [Madoff] says, are done by signals from a proprietary 'black box' system that allows for human intervention to take into account the 'gut feel' of the firm's professionals."

e.    "As for specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we

manage risk.'"

       f.      "[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'"

       g.      "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.'  He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

### 4.      The May 2001 *Barron's* Article

57.      On May 27, 2001, *Barron's* - one of the country's leading financial publications - published an article titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum."  In that article, author Erin E. Arvedlund wrote:

       a.      The private accounts managed by Madoff "have produced compound average annual returns of 15% for more than a decade.  Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year.  When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy.  I can't go into it in great detail.'  Nor were the firms that market Madoff's funds forthcoming."

       b.      "Still, some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone.  Three options strategists for major investment banks told *Barron's* they couldn't understand how Madoff churns out such numbers using this strategy."

       c.      "Adding further mystery to Madoff's motives is the fact that he charges no

fees for his money management services."

        d.     "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy.  But Madoff's investors rave about his performance - even though they don't understand how he does it.  'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told Barron's.  'People who have all the trade confirms and statements still can't define it very well.' ...  This investor declined to be quoted by name.  Why?  Because Madoff politely requests that his investors not reveal that he runs their money."

        e.     "What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me.  It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund.  'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

### 5.    The 2005 Markopolos Warning

58.    On November 7, 2005, Markopolos submitted another letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he sets forth in detail, over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real.  Markopolos identified 29 red flags that were signs of high suspicious activity in Madoff Securities, including, among others:

        a.     *'why would B[ernie] M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?'*  (emphasis in original).

b.    "The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature. . . .  *Why the need for such secrecy?  If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings.*"  (emphasis in original).

c.    "*It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from.  This makes no sense!* ...   However, BM's performance numbers show only 7 extremely small [monthly] losses during 14½ years and these numbers are too good to be true.  The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent!  And BM never had more than a one month losing streak!*"  (emphasis in original).

d.    "*Madoff does not allow outside performance audits.*"  (emphasis in original).

e.    "*Madoff returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's.*"  (emphasis in original).

f.    "*Why is Bernie Madoff borrowing money at an average rate of 16.00% per annum and allowing these third party hedge funds, fund of funds to pocket their 1% and 20% fee bases [sic] upon Bernie Madoff's hard work and brains?  Does this make any sense at all?  Typically FOF's [fund of funds] charge only 1% and 10%, yet BM allows them the extra 10%.  Why?  And why do these third parties fail to mention Bernie Madoff in their marketing*

*literature?  After all he's the manager, don't investors have a right to know who's managing*

*their money?*"  (emphasis in original).

g.    "*BM goes to 100% cash for every December 31st year-end according to*

*one FOF invested with BM.  This allows for 'cleaner financial statements' according to this*

*source.  Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud.*"

(emphasis in original).

h.    Markopolos identified Tremont as one of the four largest feeder funds

investing in Madoff.

### 6.    The 2007 Aksia Investigation

59.    In 2007, hedge fund investment adviser Aksia LLC urged its clients not to invest

in Madoff feeder funds after performing due diligence on Madoff and discovered several red

flags, including:

a.    Madoff's comptroller was based in Bermuda, whereas most mainstream

hedge funds have their own in-house comptrollers;

b.    Madoff's auditor, Friehling & Horowitz, operated out of a 13x18-foot

location in New York, New York, and included one partner in his late 70s who lived in Florida, a

secretary, and one active accountant, whereas most hedge funds are audited by a Big 3

accounting firm.

60.    Aksia discovered the 2005 letter from Markopolos to the SEC described above.

61.    Aksia prepared its client advisory after, among other things, reviewing the stock

holdings of Madoff Securities that were reported in quarterly statements filed with the SEC.

Aksia concluded that the holdings appeared to be too small to support the size of the assets

Madoff claimed to be managing.  The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a secret, unregistered investment vehicle from his office.

### 7.    Other Red Flags

62.    Madoff, instead of using an outside prime broker as nearly all hedge funds do, was his own prime broker and custodian of all the assets he managed.  A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which vets hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of assets...  There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer.  Madoff is enormously unusual in that this is not a structure I've seen."

63.    Although it was widely known that Madoff and Madoff Securities were making the investment decisions for a number of large investors, including the feeder funds, neither Madoff nor Madoff Investments were registered with the SEC as investment advisors until Fall 2006, after an SEC investigation uncovered this deficiency.  Even a cursory investigation by Defendants prior to 2006 should have uncovered this deficiency and led to a more searching investigation.

64.    A number of key positions in Madoff's operations were filled with relatives, thus raising the concern that they would act with more loyalty to the family than diligently executing the their duties to safeguard investors.  These positions included:

(a)    The Chief Compliance Officer and Director of Trading for Madoff Securities was Peter Madoff, Mr. Madoff's brother;

(b)    The chief compliance counsel for Madoff Securities was Shana Swanson, Peter Madoff's daughter and Madoff's niece;

(c)    Madoff's sons, Mark and Andrew Madoff, jointly ran the Madoff Securities trading desk;

(d)    Charles Weiner, Madoff's nephew, served as the director of administration of Madoff Securities;

(e)    Madoff's wife Ruth had an office at Madoff Securities and continued to do the office bookkeeping and pay the bills.

65.    Investors with Madoff Securities did not have electronic access to their accounts but were instead given fraudulently created paper tickets that "confirmed" trades.  This should have been a serious warning to potential investors, since Madoff Securities was known to be on the cutting edge of using computerized trading, and operated a large electronic trading room on the 19th floor of the office.

### 8.    Other Investment Advisors Declined to Invest In Madoff-related Funds Based Because of Presence of Red Flags

66.    Other investment advisors who thoroughly looked into Madoff's trading were unable to reconcile investors' account statements with the reported returns.  In a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying, "Our due diligence, which got into both account statements of [Madoff's] customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

67.     Albourne Partners, a London due diligence firm, had long-standing concerns about Madoff's trading strategy and consistent returns, and had urged clients for nearly a decade to avoid Madoff-affiliated funds such as Rye Select Broad Market.

68.     In July 2008, acting on Albourne's advice, the trustees of the Fort Worth Employees' Retirement Fund unanimously voted to liquidate its investment in Rye Select.

69.     In early 2003, a team from the investment bank of Société Générale - the well-established French financial institution - was sent to New York to perform some routine due diligence.  According to *The New York Times*:

> What it found that March was hardly routine: Mr. Madoff's numbers simply did not add up. Société Générale immediately put Bernard L. Madoff Investment Securities on its internal blacklist, forbidding its investment bank from doing business with him, and also strongly discouraging wealthy clients at its private bank from his investments.
>
> The red flags at Mr. Madoff's firm were so obvious, said one banker with direct knowledge of the case, that Société Générale "didn't hesitate. It was very strange."

N. Schwartz, European Banks Tally Losses Linked to Fraud, *The New York Times*, Dec. 17, 2008.

70.     In 2000, Credit Suisse Group AG, based in Zurich, Switzerland, recommended that its customers not invest with Madoff.  This recommendation was based on Credit Suisse's concern that (a) they could not determine how he actually made money; (b) he used a little known auditor with just Madoff as a client; (c) Madoff served as the custodian of his clients' assets.  C. Cotts, Credit Suisse Urged Clients to Dump Madoff Funds (Update1), Bloomberg.com (Jan. 7, 2009).

-23-

71.    In or around the early 2000's, Merrill Lynch Investment Management was suspicious of Madoff's reported returns.  In 2007, an internal Merrill report concluded that its European fund of funds should not have dealings with Madoff, citing a lack of transparency.  H. Sender, Wall Street "Red Light" on Madoff, *Financial Times*, Jan. 4, 2009.

72.    According to *The Observer*, Leon Gross, the former marketing director in charge of worldwide equity derivatives research of Citigroup, told colleagues in 2005 that Madoff was being "less than honest" about his returns.  J. Doran, "Bankers Kept Silent Over Madoff Fears," *The Observer*, Feb. 15, 2009.

73.    Similarly, Joanne Hill, global head of equity derivatives research for Goldman Sachs, believed something was wrong with the Madoff investment program "because the returns seemed too good to be true," and she told friends on Wall Street about her suspicions.  *Id.*

74.    Bud Haslett of Write Capital Management, an investment firm that specializes in complex options-related strategies, also "suspected something fishy."  *Id.*

75.    *Pensions & Investments* magazine quoted a CEO of one large fund-of-funds as saying of Madoff, "There were a thousand red flags, if you did the work.  It didn't take much energy to reverse-engineer Madoff's track record and find that his split-strike conversion method just would not have worked in certain markets the way he said it did."  *P.I.* online, Dec. 22, 2008.  Another executive said, "Among serious people in the industry, Madoff was a joke."  *Id.*

76.    Jim Vos, the CEO of Aksia Ltd., commenting on his company's decision not to recommend Madoff-related investments, stated, "[T]here were a host of red flags, which taken together made us concerned about the safety of client assets should they [be] invested in these feeders.  Consequently, every time we were asked by clients, we waved them away from the

Madoff feeder funds." *Pensions & Investments*, Dec. 22, 2008.

77.    Drago Indjic, a project manager at the Hedge Fund Center of the London Business School, stated, "Madoff did not pass due diligence for many European hedge fund companies." *New York Times*, Dec. 17, 2008.

78.    Notwithstanding all of the above warning and danger signs, ACM, with the active participation of the other Defendants, invested approximately $1,540,000 of the Fund's assets in Rye, a feeder fund which in turn was completely invested through Madoff and/or Madoff Securities.

79.    Had ACM and other Defendants conducted due diligence into Madoff and Madoff Securities, they would have discovered at least some of the numerous red flags identified herein. At the very least, like Aksia, Defendants should have easily discovered the existence of Markopolos' letter, the May 2001 article in *Barron's*, and the MAR/Hedge article, which would put them on notice of the numerous red flags identified therein.

80.    Even if Defendants had not uncovered actual fraud, they should have concluded from the available evidence that investments through Madoff and Madoff Securities were highly speculative and that their operating procedures displayed a serious lack of transparency, either through the lack of safeguards or the refusal to disclose information about the investment process.  Defendants' failure to heed these warning signs and red flags was inconsistent with the high duty of prudence required of fiduciaries and investment managers under ERISA.

81.    As a direct and proximate result of Defendants' failure to adequately investigate the Madoff-related securities before investing, Plaintiffs and the Class lost assets that were to be used for the sole and exclusive purpose of providing pension benefits to plan participants and

beneficiaries.

82.    On or about April 22, 2009, ACM notified Class members that it would dissolve its affiliated funds and liquidate their assets.  By letter dated May 12, 2009, ACM notified class members that it was winding down ACM's business affairs.

## CLASS ALLEGATIONS

83.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (2), on behalf of itself and the following Class:

> All employee benefit funds, through their named fiduciaries, which had named Austin Capital Management ("ACM") as an investment manager and/or allowed ACM to manage some or all of their plan assets, and whose assets were invested in whole or in part by ACM through Bernard L. Madoff and/or Bernard L. Madoff Investment Securities LLP during the period February 12, 2005 through the present (the "Class").  Excluded are defendants, their officers, directors, partners, members of their immediate families, the judge and his/her immediate family, or any of their heirs, successors or assigns.

84.    The Class is so numerous that joinder of all members is impracticable.

85.    This case presents numerous common questions of law and fact, among them being:

(a)    Did the Defendants owe a fiduciary duty to Plaintiffs and the Class;

(b)    Did the Defendants breach their fiduciary duties by investing and maintaining a portion of Class investments through Madoff and/or Madoff Securities;

(c)    Did the Defendants breach their fiduciary duty by failing to adequately investigate the soundness and suitability of Madoff and/or Madoff Securities before investing Class assets;

-26-

(d)    Were Class members harmed by the breaches of fiduciary duty committed

by Defendants;

(e)    Are Plaintiffs and the Class entitled to equitable relief through

appointment of an independent fiduciary to take control of all Defendant-controlled assets for the

benefit of the Class and all participants and beneficiaries; and

(f)    Are Plaintiffs and the Class entitled to equitable restitution from

Defendants in order to recover lost assets, for the benefit of participants and beneficiaries,

suffered as a result of Defendants' breach of fiduciary duty.

86.    Plaintiffs' claims are typical of those of the Class they represent because Plaintiffs

and all of the Class members were injured and continue to be injured in the same manner by

Defendants' breach of fiduciary duty.

87.    The questions of law and fact common to the members of the Class predominate

over any questions which may affect only individual Class members.

88.    Defendants have acted and refused to act on grounds generally applicable to the

Class, thereby making appropriate final injunctive relief or corresponding declaratory or

equitable relief with respect to the Class as a whole.

89.    Plaintiffs will fully and adequately protect the interests of all members of the

Class.  Plaintiffs have retained counsel who are experienced in class action and ERISA litigation.

Plaintiffs have no interests adverse to or in conflict with other members of the Class.

90.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.  Plaintiffs know of no difficulty that will be encountered in the

management of this litigation that will preclude its maintenance as a class action.

## COUNT I
### (Breach of Fiduciary Duty)

91.    Plaintiffs hereby reallege and incorporate by reference the allegations of the preceding paragraphs.

92.    Section 404(a) of ERISA requires that a fiduciary to an employee benefit plan act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This and other fiduciary duties under ERISA are among the highest known to law.

93.    Defendants are fiduciaries which owed a duty of loyalty to Plaintiffs and Class members under ERISA, in that it was required to act solely and exclusively in the interests of the Fund participants and beneficiaries.  As part of their fiduciary duty, Defendants owed a duty to prudently manage and invest the assets of the Fund.  Defendants breached that duty by, *inter alia*,

(a)    failing to sufficiently investigate the Madoff-related investments to insure that they were a safe, prudent, honest and suitable investment for employee pension benefit plans and their participants and beneficiaries;

(b)    failing to locate or give sufficient attention to red flags and warning signs described herein about the inadvisability of investments made through Madoff and/or Madoff Securities.

94.    As a result of the above-described conduct, Defendants have acted in violation of Sections 404, 405 and 409 of ERISA, 29 U.S.C. §§ 1104, 1105 & 1109, to the detriment of Plaintiffs and the Class.

## COUNT II
### (Liability under ERISA of Non-Fiduciary Entities, Officers and Directors)

95.    Plaintiffs hereby reallege and incorporate by reference the allegations of the preceding paragraphs.

96.    In the event that the Defendants besides ACM are not fiduciaries, they nevertheless knowingly participated in the acts and practices described in Counts I above and throughout this Complaint which violated the fiduciary provisions of ERISA to the detriment of Plaintiffs and the Class, and are therefore jointly and severally liable under Section 502(a)(3) of ERISA, as set forth in *Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 239 (2000).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants in the following manner:

A.    Certification of Plaintiffs as representatives of a Class pursuant to Fed. R. Civ. P. 23(b)(1)(A) & (2);

B.    A declaration that Defendants have breached their fiduciary duties to the Class in the manner described herein;

C.    An order appointing an independent fiduciary to administer ACM's investments in employee benefit funds consistent with the relief obtained by this litigation;

D.    Equitable restitution to the Class to remedy the harm caused to the participants and beneficiaries as a result of the imprudent and improper investments in Rye and any other Madoff-related investments, including but not limited to Class members' assets lost by being transmitted to Madoff and/or Madoff Securities, as well as investment fees and expenses paid to

ACM, Rye, and Madoff Securities;

  E.  The costs and expenses of this suit, including expenses for expert witnesses and

reasonable attorneys fees; and

  F.  Such other and further relief as the Court deems just and necessary.

Dated: June 25, 2009

           Robert M. Roseman
           Theodore M. Lieverman
           Andrew Abramowitz
           Daniel J. Mirarchi
           SPECTOR, ROSEMAN KODROFF
             & WILLIS, P.C.
           1818 Market Street, Suite 2500
           Philadelphia, PA 19103
           (215) 496-0300

           *Attorneys for Plaintiffs and the Class*

Of Counsel:
Howard Grossinger, Esq.
GROSSINGER GORDON VATZ, LLP
1000 Law & Finance Building
Pittsburgh, PA 15219

-30-